ROACH, STANSELL & CRANE v. TIMPSON et al. (No. 5352.)

(Court of Civil Appeals of Texas. San Antonio. Nov. 11, 1914.)

1. FRAUDS, STATUTE OF (§ 158*)—ACTIONS—EVIDENCE—SUFFICIENCY.

　　In an action to recover the purchase price of coal ordered by another, evidence *held* to warrant a finding that the coal was sold to defendants, and that they agreed to pay for it.

　　[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 373–376; Dec. Dig. § 158.*]

2. FRAUDS, STATUTE OF (§ 23*)—PROMISE TO PAY DEBT OF ANOTHER.

　　The fact that coal was ordered by another does not make defendants' agreement to pay for it a promise to discharge the debt of another, where plaintiff refused to deliver the coal until defendants agreed themselves to pay for it.

　　[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 18, 19; Dec. Dig. § 23.*]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by S. C. Timpson and others against Roach, Stansell & Crane. From a judgment for plaintiffs, defendant appeals. Affirmed.

Swearingen & Ward, of San Antonio, for appellant. Guinn & McNeill, of San Antonio, for appellees.

CARL, J. Appellee S. C. Timpson sued S. P. Bennett and Roach, Stansell & Crane, a partnership composed of M. J. Roach, Walker Stansell, and F. Crane, appellants, to recover for certain cars of coal, which, it is alleged, were ordered by S. P. Bennett while a subcontractor under Roach, Stansell & Crane in the construction of the Medina Irrigation Company canals. The petition alleges that Bennett ordered the coal over the telephone, but, before the order was accepted and shipped, that appellee Bennett called up Roach, Stansell & Crane, and they agreed to pay for the coal and freight; that they said they were in substance furnishing the subcontractors, and were charging them 10 per cent. on invoices; and that in view of this fact, and the further fact that they did not want the work delayed, the firm would pay the account for the coal. There is an intervention in regard to a machine which had been attached and which was under a mortgage, but we are not concerned here with that matter. The verdict was in favor of appellee for $1,569.44 against Roach, Stansell & Crane, as well as Bennett, and that firm has appealed.

[1, 2] The court submitted a charge, which was very fair to appellants, and since the allegations of the petition were sufficient to state a cause of action and to show a consideration, and that this was an original undertaking of appellants to be held responsible for the debt, and the jury has found for appellee, we are here concerned only with the proposition as to whether the evidence supports those allegations.

S. C. Timpson, the plaintiff, testified: "I made a sale of one car of coal to Mr. Bennett, to be shipped to Dunlay. He asked me what price I could place him a car at Dunlay. I quoted him $4 per ton. He said, 'I would like for you to ship me a car just as soon as you can.' I told him I would. I said, 'There is no bank at Dunlay; you will have to arrange to pay for the coal somewhere.' He said, 'I will arrange here;' and went around in the office and spoke to some one, and came back and said he had arranged. I rung up long distance, got connection with Roach, Stansell & Crane's office, and asked who it was answered the phone, and he said Mr. Silvers; and I said he was the party Mr. Bennett spoke to me

about; and he said, 'Yes, just send the bill here.' I said, 'You pay the freight.' I named $4 per ton, and 80 cents will be the freight charges. He said to 'notify the agent at Dunlay to call on me when the coal arrives here, and I will pay the freight.' I ordered the coal accordingly, sent the invoice to Roach, Stansell & Crane. Well, that was the first coal, and it was pretty close to the 1st day of March, probably a day or two ahead; and in a few days (I suppose about the 10th or 12th of April) Mr. Bennett called me up and explained that he wanted to move his teams away; wanted about ten cars more of coal to carry him through until he finished that work there. I ordered from the International Coal Company at Eagle Pass, and they wrote me they would ship it as fast as they could get empty cars. I went out to Crane's office about the 15th of February, I think, to try and sell him some feed. Mr. Crane told me there were a lot of them out there that I had better not try to do much business with, because he didn't consider them responsible, because they were likely to move them away most any time; said there were only three men out there that he considered strictly reliable, in fact their financial standing was almost as strong as his own, and he would vouch for anything they bought from me, and, if they didn't have the money to pay for it on delivery, they (Roach, Stansell & Crane) would pay for it, and charge 10 per cent. commission; that was the arrangement they had with all of them. And these three were Hale, Keys, and Bennett. Mr. Crane told me that Mr. Bennett was one of the subcontractors; that anything he bought or ordered from me, if he was not ready to pay for it—didn't have the cash in hand—Roach, Stansell & Crane would advance the money, because they had an arrangement to charge Bennett 10 per cent. The reason I let the coal go was because Crane said he would pay me half then and half next month, but was a little short of cash; expressed the opinion these irrigation engineers held him up; gave me the excuse that was the reason he was short; and gave me to understand that was the reason I hadn't received payment for the first car. Mr. Crane told me, before I ever sold Bennett any coal, that, if Bennett was not in position to pay for it when ready to deliver, he (Crane) had arrangements with these three men to pay for it; that he was glad to do it, because he would get that 10 per cent. He would charge them 10 per cent. commission on all money advanced; but I have not been paid for that coal, except the freight charges. I have not received any money for any of the coal that went to Bennett's camp. I got pay for the cars he ordered for the Syphon contract. He sent me a check for that; but I have not received pay for the balance of it, which is fifteen hundred and sixty-nine dollars and some cents. Mr. Bennett ordered these ten cars the same way, over the telephone. All these orders were placed over the phone. I ordered them from the mines, commenced to get busy, took it up to find out why I had not been paid for the first two cars. No, I did not refuse to deliver these ten cars. I would have refused to, if Crane hadn't said he would pay for them. I said I refused until Crane said he would pay for them. I would have refused to deliver the ten cars unless Roach, Stansell & Crane had guaranteed the promise to pay me, half then and half next month. Q. Did you require Roach, Stansell & Crane to guarantee the payment of Bennett's bill? A. Nothing except the first indorsement they gave me; said they would pay for it and charge him 10 per cent. on all they advanced him. Q. Did Roach, Stansell & Crane guarantee to pay it? A. Crane said he would pay half then and half next month. That is about the only guaranty I had. This was, I suppose, about the first week in April. I refused to deliver any more until I had the personal promise of Mr. Crane. Q. Promised he would guarantee the payment? A. Said he would pay me for it half then and half the next month. The irrigation engineers had underestimated the work out there and were short changing them. That was his expression."

S. P. Bennett testified in part:

"I was a subcontractor employed by Roach, Stansell & Crane to do work for them on the Medina Valley Irrigation contract, and I required coal for use in the operation of my machinery. Roach, Stansell & Crane was indebted to me at the time, and I was very short of cash, and I asked Mr. Crane, of the firm of Roach, Stansell & Crane, what arrangement could be made with reference to the purchase of coal, as it would be necessary to either pay for the coal or make arrangements for its payment on delivery. Mr. Crane stated to me that they would take care of the coal bills and charge to my account and would settle with the coal company, and that they would pay the freight on the coal as it arrived, which they did. I then stepped to the telephone and talked to Mr. Timpson, ordering a shipment of coal. I cannot remember the exact number of cars. It was my impression that the number was 15 cars. I stated to Mr. Timpson that Roach, Stansell & Crane would take care of the freight upon arrival of the coal, and would settle with him for the coal, or would see that the coal was paid for. Mr. Timpson said all right, or words to that effect, and commenced shipping the coal."

In view of the foregoing testimony, and the finding of the jury thereon, we must conclude that Timpson refused to ship the coal until appellants agreed to pay for it. And it matters little what the particular words used were, as long as they show the intention of the parties and that they understood each other, the one to be bound for the payment of the coal and the other shipping on the faith of that promise. And appellee says he would not have shipped the coal had it not been for the fact that appellants said they would pay for it. There was every reason why appellants should want the coal delivered. They not only were receiving 10 per cent. on all these bills paid for subcontractors, but they did not want the work to stop when they were under contract to finish the work for the Medina Irrigation Company. It matters little that Bennett ordered the coal. It was sold to appellants as well as Bennett, and was an original undertaking on part of Roach, Stansell & Crane to buy the coal along with Bennett. The jury so found, and we so held.

The judgment is in all things affirmed.